[No. AO16652. First Dist., Div. One. Oct. 17, 1983.]

DAVID C. JOSEPH, as Executive Director, etc.,
Plaintiff and Appellant, v.
MASONITE CORPORATION, Defendant and Respondent.

**8**

COUNSEL

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, and William D. Cunningham, Deputy Attorney General, for Plaintiff and Appellant.

Jared G. Carter and Rawles, Hinkle, Carter & Brigham for Defendant and Respondent.

OPINION

ELKINGTON, J.—The instant appeal of David C. Joseph, as Executive Director of the North Coast Regional Water Quality Control Board (Regional Board), is from the Mendocino County Superior Court's order vacating an administrative "inspection warrant" issued under the purported authority of Code of Civil Procedure sections 1822.50-1822.57, inclusive.

The issue concerns the nature of probable cause upon which such an inspection warrant may issue, in order that the Regional Board may ascertain whether the purposes of the Porter-Cologne Water Quality Control Act (Wat. Code, div. 7, §§ 13000-13983, inclusive, hereafter sometimes the Act) are being complied with. (Hereafter statutory references, unless otherwise noted, will be to the Act, as codified by the Water Code.)

A public policy of this state is declared by the Act (§ 13000): "The Legislature finds and declares that the people of the state have a primary interest in the conservation, control, and utilization of the water resources of the state, and that the quality of all the waters of the state shall be protected for use and enjoyment by the people of the state. . . ."

Among other things, Regional Water Quality Control Boards are created by the Act (§ 13200). They are charged with enforcing the water quality provisions of the Act, including the duty to prevent and abate pollution of natural watercourses within their regions (§ 13225).

Respondent Masonite Corporation was the owner of 1,065 acres of unimproved timberland (the timberland) in Mendocino County, upon which and nearby, were several streams and rivulets which flowed into the Navarro River. Proposing to commence logging operations on the timberland, it submitted a required timber harvesting plan to the state's Department of Forestry. A qualified representative of the Regional Board had accompanied, apparently consensually, the Department of Forestry's inspector upon his visit to the timberland for an environmental impact inquiry.

While on the timberland, the Regional Board's representative observed proposed logging practices, which in his opinion would likely cause pollution of the timberland's, and its nearby, watercourses. At about the same time, an adjacent landowner had expressed concern to the Regional Board over the water quality impact of Masonite Corporation's proposed logging operations; he was particularly disturbed over its probable adverse effect on the trout spawning gravels of "Pleasant Valley Creek." And in the meantime Masonite Corporation's logging operations were underway.

For these reasons, and perhaps others, the Regional Board requested permission of Masonite Corporation to enter upon the timberland and observe the logging operations. The purpose was to determine compliance with the water quality control provisions of the Act.

The request was refused.

The Act (§ 13267) provides: "(a) *A regional board, . . . in connection with any action relating thereto or authorized by this division, may investigate the quality of any waters of the state within its region.* [Italics added.] . . .

"(c) In such an investigation, the regional board may inspect the facilities of any such person to ascertain whether the purposes of this division are being met and waste discharge requirements are being complied with. Such inspection shall be made with the consent of the owner or possessor of such facilities or, if such consent is refused, with a warrant duly issued pursuant to the procedure set forth in Title 13 (commencing with Section 1822.50) of Part 3 of Code of Civil Procedure; . . ."

■ We observe initially, that the *very essence* of the search and seizure provisions of the Fourth Amendment is that the concerned state intrusion *must be reasonable.* (*People* v. *Ingle* (1960) 53 Cal.2d 407, 413 [2 Cal.Rptr. 14, 348 P.2d 577].) The Act's command to "investigate the quality of any waters of this state" in accordance with the related public policy would be but an idle and frivolous legislative gesture, were the owners of

the land over which the state's waters flow constitutionally permitted to bar the investigators from their mandated duty. Many would agree that the governmental sanction of such a refusal would be *unreasonable.* If that be so, then the constitutional argument of Masonite Corporation must be rejected.

But we respond to Masonite Corporation's more specific arguments.

Code of Civil Procedure sections 1822.50-1822.57, inclusive, relate to judicially issued administrative inspection warrants. Such an inspection warrant may be issued only, as relevant, where consent to inspect has been refused, and "only upon cause." (§ 1822.51.) "Cause shall be deemed to exist if . . . there is reason to believe that a condition of nonconformity exists with respect to the particular place, dwelling, structure, premises, or vehicle." (§ 1822.52.)

The Regional Board sought from, and was granted by, the superior court such an inspection warrant. But thereafter, on Masonite Corporation's petition the warrant was vacated by order of the court. The appeal before us was taken from that order.

The order was based upon the superior court's conclusion that there was "no reason to think that any violations have occurred."

In the trial court, and now before this reviewing court, Masonite Corporation has contended: "that a greater showing of cause, equivalent to probable cause in the criminal sense, must be shown by the Regional Board before any inspection warrant could be upheld as constitutional in this case."

Thus the argument is made that such authority as is given the Regional Board by the Act and Code of Civil Procedure section 1822.50, to "investigate the quality of any waters" upon Masonite's timberland, is here invalid as permitting a constitutionally forbidden search.

We disagree for the following reasons.

Masonite Corporation's unimproved timberland, for the purposes of any constitutional discussion, will reasonably be deemed, or equated with, *"open fields."*

It had long been the nation's high court's holding that "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law."

(*Hester* v. *United States* (1924) 265 U.S. 57, 59 [68 L.Ed. 898, 900, 44 S.Ct. 445].) But some doubt was thereafter cast upon the absolutism of that holding by the court's later declaration in *Katz* v. *United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 581, 88 S.Ct. 507], that "the Fourth Amendment protects people, not places." And then, elaborating *Katz,* the court thereafter stated that "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (*Rakas* v. *Illinois* (1978) 439 U.S. 128, 143 [58 L.Ed.2d 387, 401, 99 S.Ct. 421].)

California's high court had anticipated the holding of *Rakas,* when in *People* v. *Bradley* (1969) 1 Cal.3d 80, 84 [81 Cal.Rptr. 457, 460 P.2d 129], it stated: "A number of cases in upholding searches in open fields or grounds around a house have stated their conclusions in terms of whether the place was a 'constitutionally protected area.' . . . That phrase, however, does not afford a solution to every case involving a claim of an illegal search and seizure . . ., and we believe that an appropriate test is whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion."

But although the absolute authority of *Hester's* "open fields" doctrine has been impugned, *the rationale continues in its application.* ▮ For as said in *People* v. *Dumas* (1973) 9 Cal.3d 871, 881-882 [109 Cal.Rptr. 304, 512 P.2d 1208]:

"The pattern of prior decisions suggests that one of the most crucial determinants of the validity of warrantless searches is the nature of the place subjected to search. . . . The courts have implicitly recognized that man requires some sanctuary [such as the home] in which his freedom to escape the intrusions of society is all but absolute. Such places have been held inviolate from warrantless search except in emergencies of overriding magnitude. . . . Certain other places carry with them an expectation of privacy which, although considerable, is less intense and insistent. These places may be searched upon probable cause alone under circumstances of less demanding urgency. *Still other sites are regarded as so public in nature that searches are justifiable without any particular showing of cause or exigency.* [10] This hierarchy of protection arises not from the application of differing constitutional standards to various locales, but rather from an application of a single standard of reasonableness to all places in accordance with a fundamental understanding that a particular intrusion into one domain of human existence seriously threatens personal security, while the same intrusion into another domain does not."

"¹⁰*This category includes places that may be classified as 'open fields.'*'" (Italics added.)

And today, in the federal court system: "The 'open fields' doctrine regards technical trespasses or insignificant intrusions onto the open exterior areas of private property as 'de minimis' and immaterial to the validity of observations made as a result of such intrusions." (*Balelo* v. *Klutznick* (S.D.Cal. 1981) 519 F.Supp. 573, 576; and to the same effect, see *United States* v. *Cain* (7th Cir. 1972) 454 F.2d 1285, 1287; *United States* v. *Capps* (9th Cir. 1970) 435 F.2d 637, 640; *Atwell* v. *United States* (5th Cir. 1969) 414 F.2d 136, 138; *United States* v. *Watt* (N.D.Cal. 1970) 309 F.Supp. 329, 330.)

Moreover, even had the Regional Board's representative gone upon Masonite's timberland without authority of statute, or otherwise, its action would reasonably have been no more than a *trespass*. ■ "The prohibition in the [Fourth] amendment is against unreasonable searches and seizures, not trespasses." (*People* v. *Terry* (1969) 70 Cal.2d 410, 427 [77 Cal.Rptr. 460, 454 P.2d 36]; *United States* v. *Jackson* (4th Cir. 1978) 585 F.2d 653, 659-660.)

■ Accordingly, there was no constitutional flaw in the issuance of the inspection warrant issued to the Regional Board, or otherwise.

We are unpersuaded that because Masonite Corporation might, under the Act, have become liable for misdemeanor violations of its water quality control provisions, the evidentiary showing for an inspection warrant must be greater vis-à-vis a subject who may not be so incriminated.

■ The Fourth Amendment, as is well known, is designed to protect the legitimate privacy rights of all persons, the innocent and guilty alike. For were it otherwise, in the state's investigation and pursuit of the guilty, the privacy rights of the innocent would, as experience has shown, often and inevitably, be invaded. But it would be strange constitutional doctrine that would favor the criminally disposed, by requiring a *lesser* showing of probable cause for a search of the "persons, houses, papers, and effects" of those more clearly innocent vis-à-vis those more likely guilty.

■ Nor do we find merit in the argument that before an inspection warrant may issue in a case such as this, "*proof*" must be made of actual water quality violations. Such proof would be far more substantive than that of the criminal law, which requires no more than the conscientious and strong suspicion of a reasonable person. (See *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485].) And where

*proof* is already available it would seem idle to seek a warrant for further investigation or inspection.

The case of *Salwasser Manufacturing Co.* v. *Municipal Court* (1979) 94 Cal.App.3d 223 [156 Cal.Rptr. 292] offers no aid to Masonite Corporation. It dealt with an inspection warrant issued under Code of Civil Procedure section 1822.50, purportedly permitting a routine nonconsensual entry upon a "place of business to discover safety violations." Such a place is far higher on the graduated scale of constitutional concern (see *People* v. *Dumas, supra,* 9 Cal.3d pp. 881-883) than was the unimproved timberland of the case at bench. (See *People* v. *Dumas, supra,* 9 Cal.3d pp. 881-882.) Since the case is inapposite to our problem, we express no views as to the here debated correctness of its holdings.

The order is reversed.

Racanelli, P. J., and Newsom, J., concurred.